GEO. A. THAYER & CO. *v.* HORACE C. BALLOU.

*Contract.    Sale.*

The defendant purchased goods of the plaintiffs, each party supposing that a credit of six months was given, but this supposition rested on the mutual but erroneous belief that the credit of a third party had also been pledged for the purchase; *Held,* that the vendors could not on the discovery of the mistake as to the liability of the third party, treat the sale as one for cash, and maintain an action in book account or assumpsit for the price of the goods, before the expiration of the six months.

---

BOOK ACCOUNT. The auditor reported the following facts:

The writ was served on the 24th of November, 1857, and the plaintiffs claimed to recover the amount of three bills of goods purchased of them in Boston by the defendant's agent, one Dodge, on the 3d of September, the 11th of September, and the 8th of October, 1857, respectively.

The sale and delivery of the goods as charged was admitted by the defendant, but he claimed that they were purchased upon a credit of six months, and therefore that this action was prematurely brought.

About the 1st of September, 1857, the defendant proposed to open a boot and shoe store in Montpelier. He was without property and credit, but his father, Eli Ballou, was pecuniarily responsible, and, without however having any pecuniary interest in the business, proposed to aid the defendant in procuring a stock of goods, and for that purpose went to Boston, taking with him one Dodge, who was the defendant's agent, to purchase a stock.

Eli Ballou had interviews with several boot and shoe dealers in Boston, and among them one Whitcomb, the plaintiffs' clerk, and gave them assurances that whatever goods should be selected by Dodge for the defendant at their respective stores, should be paid for. The goods charged in the plaintiffs' account were delivered upon this assurance of Eli Ballou, and without it the sale would not have been made. The goods, however, were charged by the plaintiffs directly to the defendant, and to him alone.

Eli Ballou, at his interview with Whitcomb, above referred to, told him that the defendant was without property, and would expect "a credit" or "time," but the matter was then left indefinite and uncertain whether any goods would be purchased of the plaintiffs.

Nothing was said between the plaintiffs or Whitcomb and Dodge, or Eli Ballou, as to any particular time of credit upon which these goods were purchased. The plaintiffs and Dodge both expected that Eli Ballou would call upon the plaintiffs and make some more definite arrangement in regard to the goods before they were delivered, but being called away on other business he did not do so. The plaintiffs expressed some disappointment because he did not call, but Dodge affirmed that Eli Ballou

was entirely responsible, and the first bill of goods was thereupon delivered without objection.    The plaintiffs were aware that Dodge had selected other goods at other houses, that Eli Ballou had in some form become responsible, and that a credit (in most cases of six months) had been given.

The auditor further reported that he did not find that any express agreement was made between the plaintiffs and Dodge, or any person acting for the defendant, to give the latter an absolute credit of six months; but that he did find that the purpose of Eli Ballou and of Dodge was to purchase on credit; that allusion was made by Dodge, at the time these goods were selected, to his purchases at other houses upon a credit of six months, and that from what was said and done at that time the plaintiffs expected to give, and they supposed Dodge expected to receive, in behalf of the defendant, a credit of six months ;- and that this understanding- or mutual expectation of the parties was in a great measure to be referred to the fact that the defendant was represented as without capital, and under the necessity of obtaining goods upon a credit, and paying by the resales.    At the same time the plaintiffs supposed that Eli Ballou was ready at any time to assume a legal liability to pay for the goods in question; and indeed that he was then already under such a liability; and the expectation on the part of the plaintiffs of giving a credit, and on the part of Dodge of receiving one, rested on the mutual belief that Eli Ballou's credit had been actually pledged for the purchase.

The goods charged under the date of September 11th, and October 8th, were delivered upon written orders of the same dates.    No other communication was had between the parties in regard to these goods except these orders, which contained nothing concerning a credit.    When Dodge selected the first bill of goods he remarked to the plaintiffs that the defendant might wish to order some goods from time to time, and the plaintiffs replied that if he did so they would do well by him, or " would do the fair thing," but nothing was said about a credit.    The auditor, however, found that the plaintiffs expected to give, and the defendant to receive a credit of six months, at the time these orders were filled, but that both in regard to these bills and the first one,

the plaintiffs never intended to tie themselves so that they could not sue for the debt at any time, if it became precarious.

Soon after the three parcels of goods had been delivered, the plaintiffs sent a note to the defendant, dated September 9th, 1857, for the amount of the plaintiffs' account, payable to the order of the defendant, in six months from date, without interest, with the request that the defendant would procure his father's signature, and indorse the note himself, and return it to the plaintiffs. The defendant signed the note himself, and returned it to the plaintiffs, with notice that his father declined to sign it. The note was immediately sent to Heaton & Reed, as attorneys for the plaintiffs, with notice that they declined to accept the note, and directing them to return it to the defendant; and soon after, Whitcomb, in behalf of the plaintiffs, went to Montpelier to obtain security for the debt, and applied to the defendant and his father for security. Eli Ballou declined to sign any note for the debt, or assume any legal obligation to pay the same, but admitted that he " gave his word," and that he should feel morally bound to pay the debt if the defendant did not. The plaintiffs immediately commenced this suit, and returned to the defendant his note.

When Whitcomb came to Montpelier for the purpose of seeing if the debt was secure, and Eli Ballou declined to assume any legal liability, the latter proposed to Whitcomb that he would cause the defendant to deliver to Whitcomb the goods bought of the plaintiffs that were on hand, and pay for what had been sold, but Whitcomb declined this proposition.

Upon this report, the county court, at the March Term, 1859, —BARRETT, J., presiding,—rendered judgment *pro forma* for the plaintiffs, to which the defendant excepted.

*J. A. Wing*, for the defendant.

*Heaton & Reed*, for the plaintiffs.

ALDIS, J. The questions presented to us depend rather upon the construction to be given to the auditor's report, than upon the principles of law applicable to the facts found by the auditor.

If an absolute credit of six months was given to the defendant, it is clear the plaintiffs cannot recover.

If the contract was, a credit for six months if Eli Ballou's guaranty was furnished, but no credit for any period of time if his guaranty was not furnished, then the plaintiffs can recover.

These conflicting constructions are put upon the report.

The auditor says, that when Eli Ballou and Whitcomb had their interview, Ballou told Whitcomb that the defendant had no property, and would expect " a credit" or " time." When the goods were selected by Dodge (the defendant's agent) at the plaintiffs' store, he alluded to his purchases at other houses upon a credit of six months. The defendant was represented as without capital, and under the necessity of obtaining goods upon a credit, and paying by the resales. This testimony tended to prove the conclusion to which the auditor states that he came, viz: that the plaintiffs expected to give, and supposed Dodge expected to receive, on behalf of the defendant, a credit of six months. This mutual understanding of the parties made a contract, though no express agreement was made in form or in words. So far, then, the minds of the parties met. And this mutual understanding was derived from what was said between them on the subject, and from putting a natural construction on what was said. It was not mere conjecture or expectation formed in silence and without premises to sustain it.

Was this understanding qualified by the condition, that if Eli Ballou did not give his guaranty, then the sale was not to be upon time? The auditor says that the plaintiffs did not notify the defendant, or Dodge, or Eli Ballou, that the credit would depend on Eli Ballou's becoming legally liable for the debt, and that there was no conversation about it. We are unable to find from the report that there was any evidence tending to show anything said or done from which either party could have gotten such an understanding. " The plaintiffs never intended to tie themselves so that they could not sue for the debt at any time, if it became precarious;" but this intent seems to have been kept to themselves, not communicated to any one, and to have been inconsistent with what was said and expected as to the six months credit.

The auditor also says, that the expectation of giving a credit on the part of the plaintiffs, and of receiving it on the part of Dodge, rested on the mutual belief that the credit of Eli Ballou

had been given, and, substantially, that but for this belief the plaintiffs would not have sold the goods.

The report further shows, that the credit of Ballou had not been given, that there was no fraud, false representation or artifice of any kind on the part of Ballou or Dodge, or the defendant, indeed, that nothing was said or done to lead the plaintiffs into the error. Whether they mistook the law and supposed Ballou's word legally bound him, or whether they misapprehended what he said and supposed he was pledging his credit by an original and not a collateral undertaking, does not clearly appear. However the mistake arose, it appears to have been without fault on either side, and to have been shared alike by the plaintiffs and the defendant's agent. Now this is the most favorable view of the report that can be taken for the plaintiffs. Upon the discovery of the mistake what would be the respective rights of the parties ? Could the plaintiffs say with justice, " the basis upon which I gave and you received the credit having failed, I have the right to treat it as a sale for cash, and demand immediate payment ?" The defendant might reply, " the mistake was as much yours as mine, more even, for it was for you and not for me to know with certainty what security you had for the sale of the goods; again, if I had not had the six months credit I should not have bought the goods." What did transpire between the parties on finding out their error, relieves us from the necessity of deciding as to these conflicting claims. Eli Ballou offered to return the goods on hand, and to pay for those sold. The plaintiffs refused this offer, and soon after, and without further demand, brought this suit. Clearly, they had no right to say you shall keep the goods, and shall pay us down for them. That would be visiting the mistake upon the defendant, as if it was his fault. If it gave the plaintiffs any right to treat the whole sale as a mistake and the contract as being ended, they could not reasonably ask the defendant to do more than to pay for the goods sold and return the residue. The plaintiffs would not do this, substantially would not take back the goods. If they would not put an end to the contract, clearly they could not make one for the defendant to suit themselves. If they chose to stand on contract, they could stand only on the contract as made. Between

affirming the existing contract, or putting an end to it and taking back the goods, there was no middle ground.

Again, if the defendant had been in fault, (as by using false representations, etc.,) that would not have enabled the plaintiffs to have sued in assumpsit, or book account, till the expiration of the six months credit. So are all the authorities; 18 Vt. 235; 16 Vt. 108 and 164.

Much less could the plaintiffs sue in such forms of action when there was no fault on the defendant's part. A mutual and innocent mistake ought not to put the defendant in a worse condition than an actual fraud.

It is said the plaintiffs might recover for the goods sold.

1. The report does not show that any goods were sold. The defendant's father offered to return the goods on hand and pay for what had been sold, and that is all that appears upon that point in the report.

2. After such offer and refusal of it by the plaintiffs, clearly they would have no right to sue till they had offered to take back the residue of the goods, and had demanded pay for those sold. Without this there would be no disaffirmance of the contract; we do not decide that with it the action would have been maintainable.

The decision in *Hickling* v. *Hardy*, 7 Taunton 311, stands upon a ground wholly distinct from the principle here involved. The defendant bought goods and gave the plaintiff a bill in payment. When the bill was presented for acceptance it was protested for non-acceptance. What then was the right of the drawee? To sue instantly for the amount of the bill. That was the meaning of the contract. Now as to credit for the goods, that case shows none given but what was implied in taking the bill. The contract implied, in commercial law, from that was, if the bill is accepted the vendor shall have his pay when the bill matures, if not accepted he shall have his pay when acceptance is refused. That decision stands upon the implied contract of the parties. If there had been any express contract for credit for a definite period of time, it would have altered the case.

In the view we take of this case the judgment must be reversed, and judgment rendered for the defendant.